SCHAFF v. GOOCH.    (No. 6079.)

(Court of Civil Appeals of Texas.  Austin.
Nov. 19, 1919.  On Motion for Re-
hearing, March 3, 1920.)

1. RAILROADS ⟜400(14) — SUBMISSION OF
DISCOVERED PERIL NOT WARRANTED BY EVI-
DENCE. ·

In a suit for the death of a pedestrian
struck by an engine in defendant's railroad
yards, held, on the evidence, that court erred
in submitting question of discovered peril.

2. NEGLIGENCE ⟜83—DOCTRINE OF "DISCOV-
ERED PERIL" DEFINED.

For a recovery to be had under the doctrine
of discovered peril it must be made to appear
that the injured party was in a position of im-
minent danger, and that defendant, or those
acting for him, discovered the dangerous situa-
tion of the injured party in time to have avert-
ed the injury by the exercise of proper care.

[Ed. Note.—For other definitions, see Words
and Phrases, Second Series, Discovered Peril.]

3. RAILROADS ⟜400(10) — CONTRIBUTORY
NEGLIGENCE OF PEDESTRIAN IN RAILROAD
YARDS QUESTION FOR JURY.

In a suit for the death of a pedestrian
struck by an engine in defendant's railroad
yards, held, that question of contributory negli-
gence was for the jury.

4. APPEAL AND ERROR ⟜930(4)—WHERE GEN-
ERAL VERDICT IS RENDERED CASE WILL BE
REVERSED FOR ERRONEOUS SUBMISSION OF
QUESTION OF DISCOVERED PERIL.

Where there was a general verdict for
plaintiffs, and it is impossible for the court on
appeal to know, or for appellant to show, that
the verdict was not based on the theory of dis-
covered peril erroneously submitted, the judg-
ment will be reversed.

On Motion for Rehearing.

5. APPEAL AND ERROR ⟜882(14)—REQUEST-
ING INSTRUCTION ON DISCOVERED PERIL DOES
NOT ESTOP APPELLANT FROM CLAIMING THAT
QUESTION SHOULD NOT HAVE BEEN SUBMIT-
TED.

That appellant requested instructions relat-
ing to question of discovered peril would not
estop him from claiming that the question
should not have been submitted; appellant, who
objected to submission of question, seeking by
the requests merely to have views of his coun-
sel presented, should the question be submitted.

Appeal from District Court, McLennan
County; H. M. Richey, Judge.

Suit by Mrs. Ethel M. Gooch, for herself
and as next friend for two minor children,
against C. E. Schaff, receiver of the Missouri,
Kansas & Texas Railway Company of Texas.
Judgment for plaintiff, and defendant ap-
peals.  Reversed and remanded.

Spell, Boggess, Naman & Penland, of Waco,
and C. C. Huff and A. H. McKnight, both of
Dallas, for appellant.

Williams & Williams, of Waco, for appel-
lee.

KEY, C. J.  Mrs. Ethel M. Gooch brought
this suit for herself and as next friend for
two minor children to recover damages for
the alleged negligent killing of Ben F. Gooch;
and a trial thereof resulted in a judgment
against the defendant, as receiver of the
Missouri, Kansas & Texas Railway Company,
for $20,000, $5,000 of which was apportioned
to Mrs. Gooch and $7,500 to each of the minor
children.  There was a jury trial, and the ·
case was submitted to the jury by a general
charge, which required as a predicate for a
verdict for the plaintiffs that the jury should
find that one or both, the engineer Ballard or
the brakeman Cantrell, were guilty of negli-
gence which was the proximate cause of the
death of Gooch, and that the latter was not
guilty of contributory negligence; or that
the brakeman Cantrell discovered Gooch in a
position of peril in time, by the exercise
of due care and diligence, to have taken
steps which would have avoided the death
of Gooch, in which event contributory negli-
gence on the part of Gooch would not prevent
a recovery.

[1] Appellant has assigned error upon, and
in his brief urges numerous objections to,
the charge of the learned trial court, all of
which are regarded as untenable, except the
second assignment of error, which is predi-
cated upon a timely objection to the court's
charge submitting to the jury the question
of discovered peril.  After repeated and care-
ful consideration of all the testimony relat-
ing to that issue, we feel compelled to sustain
appellant's contention, that the proof failed
to show that Cantrell saw the deceased upon
the track and discovered his perilous situa-
tion in time to have prevented his death.  In
considering this question we give appellees
the benefit of the following statement, copied
from their brief:

"Deceased, Ben F. Gooch, was killed in ap-
pellant's railroad yards by an engine which was
backing down on what is known as the Texas
Central main line, which runs through the mid-
dle of said yards.  The railroad yards had been
graded down below the surface from 5 to 15
feet, and were practically covered with many
tracks and switches.  The ground was practi-
cally level and smooth, being covered with cin-
ders and gravel, and running through the mid-
dle of said yard from southwest to northeast
were two main parallel tracks about 15 feet
apart; one, the west track, known as the north
lead.  There were some 16 switches leading
off from said north lead in a southwest direc-
tion.  The other main parallel line was known
as the Texas Central main line; there were
eight switches leading off from said Texas Cen-

⟜For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

tral main line in a southeast direction; these switches. were known as rip track switches.

"Between the two main lines above mentioned were situated the switch stands, which controlled the switches to the different yards. Those controlling switches on one side from the north lead were known as the yard switches, and those controlling the switches that led off from the Texas Central main line were known as the rip track switches. The rip track switch stands were located near the west rail of the Texas Central main line, and the yard switch stands were established near the east rail of the north lead; both of said switch tracks in the space about 15 feet wide between the two main lines that ran through the central part of the yards; said space between the two main lines being level and practically smooth and straight; no obstacle of any kind being in it from one end of the yard to the other, except the switch stands referred to. The yards were so constructed that a person could stand at any part of the yard when clear of cars and see all over the entire yard from one end to the other and from one side to the other; the same having a very slight grade sloping from the northeast to the southwest.

"There was on the west side of the yards a wooden stairway with handrails on the same, running from the level of the yard up the embankment to the level of the surrounding country. From the top of said stairway in a westerly direction was a cinder path built by the company to a little jitney house about 300 feet away, built by the company for the accommodation and use of its employés, where they could go to take a jitney service car from the yards to their residences, some of which were in the city of Waco, 2 miles away. On the day the deceased was killed, and shortly prior thereto, he telephoned to an employé in the yards whom he knew, and advised him that he was coming out with his father-in-law, Hon. S. P. Mills, to electioneer with the employés of the company in the yards; his said father-in-law being a candidate for one of the commissioners of the city of Waco. A few minutes before his death 'he, in company with his father-in-law, arrived at the jitney house, alighted, and started down the cinder path towards the stairway which led down into the yards. Just opposite this stairway on the other side of the yard was located a big workshop, and a little south of that was a round-house, and other improvements for handling engines, etc. Deceased was not seen from the time he started down the cinder path until he had gotten out in the yards, at which time a long freight train, being then pulled by engine 835, pulled in on switch track 13, coming in from the southwest end of the yard, going northeast; the different ends of these yards being known as the north and south ends. Said engine pulled up in a short distance of the north lead and stopped and was disconnected from said train; pulled out onto the north lead and went on north to cross over to the north end of the yard; pulled out across the crossover to the Texas Central main line, switches being thrown at all these points; and then backed down the Texas Central main line on its way to the roundhouse. The deceased, with his father-in-law, was on his way over to the car sheds and workshops, and the string of box cars just pulled in prevented them from going straight across. They were seen to be on the west side of said train which had just pulled in by the fireman and others in charge of said train. They were next seen coming around the end of said train after the engine had been cut loose therefrom, and had gone on up towards the north end of the yard. They were next seen approaching the space between the north lead and the Texas Central main line. At the time that they crossed over the north lead there was a switch engine pulling out of switch track 9, which was south from them, coming north on the north lead. They crossed over in front of this engine somewhere between 150 and 400 feet north of it; witnesses differing as to how far they were from the switch engine when they crossed the track into the space between the two main lines. They were next seen by the crew on the switch engine as the switch engine passed them while they were walking down between the two main lines over close to the west rail of the Texas Central main line, upon which they were afterwards killed. They were seen in this space by the crew of the switch engine as they passed each other. They were next seen by Switchman Murray Nance, who was setting the switches ahead of the switch engine, going on down in a diagonal way across the 15-foot space, apparently starting to the sheds, which were southeast of them and in a diagonal direction across the yard. They were run over and killed at a point about 15 feet north of the rip track switch No. 8, which is just a little north of the north lead switch stand No. 9. Mills' body was left lying a little north of rip switch stand 8, and Gooch's body was 21 steps south from that point; the engine having dragged Gooch further than it did Mills. The evidence is conflicting as to the exact point where the deceased was when he was hit. Most of the witnesses place it just opposite switch stand 10 on the north main lead; others place it north of that point; but none south of that point.

"The switch engine on the north main lead stopped upon the happening of the accident, and the engine was 9 car lengths north of Mills' body. There is some conflict in the testimony as to how far engine 835 (that killed Gooch) ran after hitting him, but it is practically uncontradicted that the pilot of the engine was about even with the north end of the car shed, which was about opposite switch stand 8 on the north main lead.

"The evidence shows conclusively, by all the witnesses, that it was a clear day, with considerable wind from the southeast; that there was absolutely nothing to obstruct the vision of any of the operators of the engine 835 or prevent them from seeing Mills and Gooch from one end of the yard to the other, nor was there any obstruction to prevent Mills and Gooch from seeing the engine in the north end of the yard and all the way down until they were run over, had they been looking after the engine had gone across from the west to the east side of the yards. There was proof that they were walking along by the side of the switch engine and the train that it was pulling out on the north main lead near the west side of the Texas Central main line. Cantrell, the brakeman, was standing in the stirrup on the

hind end of engine 835 in the proper place; he testified that he was looking directly down the track from the time he got on at the crossover until the men were run over; that he had good eyes and good ears; and that there was nothing to prevent him from seeing these men. The engineer on the switch engine testified that there was nothing to prevent him or any one else from seeing the men in the space along by the side of the track. The fireman on the road engine 835 testified that there was nothing to prevent him from seeing these parties walking along by or on the track, but that he was attending to other duties until just at the time of the accident. Other witnesses testified that he was hanging out of his cab window on the same side that Gooch and Mills were on at the time they left the crossover going south on the Texas Central main line; that he passed the switchman who was setting up the switch ahead of the switch engine, and he was in that position looking south down the track toward Gooch and Mills; the crew in charge of the switch engine testified that he was in that position when the two engines passed and that they spoke.

"Engineer. Heise, in charge of the road engine, testified that there was nothing to prevent Cantrell or him from seeing the parties down by the track until they got so close that his tender and engine cab would obstruct his view, as he was on the opposite side of the engine from the path that Gooch and Mills were walking in.

"Cantrell, the switchman, testified that he did not see Gooch until he was within 5 or 7 feet of the back end of the tender in the middle of. the track.

"L. E. Jeans, a brakeman on the switch train, testified that the road was absolutely clear, and there was nothing to prevent Cantrell or the fireman in charge of 835 from seeing Gooch and Mills. Numerous witnesses testified that the track along where Gooch and Mills were killed was commonly used as a crossing place by the public, and that employés of the company were in and over all parts of the yard at all times, and that school children passed backward and forward between the tracks, there being practically no testimony to the contrary; and the only conflict in the testimony as to this point is the extent of the use of the track at that place by the public and people generally and the employés of the company at that time."

Cantrell, the brakeman, testified that as soon as he discovered the deceased and his companion on the track in front of the moving engine he gave the stop signal to the engineer; and the latter testified that upon receiving that signal he used all the means at his command to stop the train, but failed to do so in time to prevent the engine from running over and killing Gooch and his companion. No witness testified to seeing Gooch and Mills upon the track in front of the moving engine except the brakeman Cantrell, who testified as follows:

"After I got my engine on the main line of the Texas Central I rode the rear end of the

218 S.W.—50

tank and was looking down the Texas Central main line track. There was no train there to obstruct my view and there was no cars there. It was a plain open view there. I could not see the roundhouse. There was a track leading off of that track. The weather was fair.

"The first time I saw Mr. Mills and Mr. Gooch was when they got on the track; walked on the track. They did not walk down the track. They did walk a little bit angling. They came on the track angling like they were going across. They looked like they were going over to the car sheds. At that time I was riding on the rear end of the tank of the engine. The switch engine had passed me, but I do not remember how far it had gone. They came to this track somewhere about No. 10 switch stand, and they were angling down across the track. I was looking right down the track.

"The number of my engine was 835. I do not know exactly how long those engines are. I do not know how much one will weigh. It was my duty to ride back there and do whatever was necessary to do. If there was anybody on the track I was supposed to look out for them. I was supposed to look out for people on the track and open and throw switches. They were about middle way of the track when I first saw them in the main line of the Texas Central and about middle ways of the track. As to whether or not I gave any signal from the time we got on the main line of the Texas Central until after we ran over these men, I gave a signal just when I first saw them on the track to the engineer. I gave the signal just as I jumped down on the ground and holloed. I gave the stop signal and jumped off. I did not give any other signal, just the stop signal. I did not look to see the engineer, but I guess I could have if I had looked. There was nothing to prevent the engineer from seeing me. I testified that the switch engine had passed me and was working steam and was pulling out a string of cars. They were on that lead track which is parallel with the Texas Central main line, and no other person could cross that track on account of those cars being pulled out by the switch engine.

"When I first saw these men they were going across the track towards the shed, but I do not know where they were going. They were headed that way towards the car sheds. They were not going at right angles, just kind of angling. They had their backs towards the engine and were angling across the track.

"There was nothing there to prevent me from seeing them; that is, there was no obstruction there. Possibly I would have seen them. There was nothing there but two rails, some ties, and a string of cars as a background. That was the background. There was nothing in the way to prevent me seeing them if they had been walking along by the track. If I had looked, I do not know about seeing them. I was looking down the track. I was looking south and they were south of me. I guess my eyes traveled over that portion of the track where they got on just before the accident. I was on the fireman's side of the track backing up. I was on the engineer's side, hanging on the side of the tank. On the fireman's side of that main lead there was a string

of box cars being pulled out by the switch engine.

"We hit them close to No. 10 switch; I believe it was a little bit south. That would be in the direction in which we were going. There was a string of cars on that main lead right by the side of the engine after we stopped. At the time we hit them I believe they were moving a string of cars along there, and they were rattling and making lots of noise.

"My whole attention was centered right down that track just previous to the accident, and had been from the time I had started backing down, and I was looking right down the track.

"I did not see these men cross over in front of the engine, nor I did not see any one else cross over in front of the engine. After I hopped off that engine I told the engineer that we had run over two men and started back to see what we could do for them. I hopped off before we hit them. I started and run up there. By that time some car men and several others were there.

"After the engine hit them it ran on two or three car lengths after I gave the signal. I was keeping a lookout down the track and the way I was going. I did not turn my head looking in any other way or at any other person from the time I started my engine back toward the roundhouse. The fireman was on the engine, and the engineer was on the engine, and I was on the side of the tender on the engineer's side. I could see the engineer when I was looking in his direction. I could not see the fireman. I knew that the brakes had been applied in emergency before they were struck. I could hear the engineer applying his brakes in emergency and saw him.

"I stated that the engine was going 7 or 12 miles. That is purely my opinion. I do not undertake to say that it was going over 7 or 12. It might have been going less than 7, and it might have been going more than 12 miles an hour. I have no way that I could tell the exact speed my engine traveled. It is just purely a matter of opinion.

"I was looking right down the track with all the eyes I had, looking in the direction my engine was moving. After I got on the Texas Central main line and had started back this Texas Central main line was clear down to the track that leads off to the roundhouse.

"I don't know exactly how far this switch engine had passed me when this accident happened. I would estimate it at about two car lengths; something about that; but would not be positive. I did not say that that switch engine had gone about two car lengths from the back end of my engine before I jumped off. I mean what I said. By two car lengths that is where it has passed after we had stopped. They had gotten that far by. I mean that the switch engine had not gotten but two car lengths after my engine stopped at stand No. 10. Switch stand No. 8 is about even with the car sheds. My engine stopped about switch stand No. 8 after it ran over the two men.

"I saw the switch engine before I hit the men on track No. 9. The first time I noticed it, it was pulling out track No. 9. I could see it from the time I got on the main line. When I got out on the Texas Central I first say it on No. 9 on the main lead. It was coming towards me, and we passed about switch stand

No. 10, and we struck these parties at about No. 10.

"The first time that I saw the men that I afterwards learned were Mr. Mills and Mr. Gooch after I got into the yards was just about somewhere between 5 and 7 feet before we struck them. When I first saw them they were inside of the rails somewhere near the middle of the track of the Texas Central main line. When I first noticed them they were kind of angling across the track, and they were a little closer to the west side than they were to the center of the track. I did not see them as they stepped up on the track. They were already inside the rails when I first noticed them. There was something to prevent me from seeing them step up on the track—the tank of the engine would be in the way. I was riding on the side of the tender, the east side, engineer's side, standing on the steps of the tender, located on the side of the tender near the end, and as the engine was moving down the track south I was looking south in the same direction.

"I do not know where Mr. Mills and Mr. Gooch were walking immediately before I saw them about 7 feet ahead of the tender of the engine. I do not know exactly what rate of speed our engine was going when I first saw them, but I judge we were going anywhere from between 7 and 10 or 12 miles an hour. I do not know about the speed. That would be just my guess or opinion about it. When I saw them on the track I holloed and gave the stop signal; holloed very loud and gave the signal to stop as I jumped off. The way the violent stop signal is made, as I made it then, is in this way (indicating), and the engineer got that signal and set the air into emergency at once. I could hear it. After I heard the air go into emergency the engine and tender ran somewhere between two and three car lengths. The ordinary car length is 36 feet.

"When I leaped from the engine and holloed and gave that violent stop signal Mr. Mills and Mr. Gooch did not do anything. After that I did not observe anything. I did not look at them because I knew it was impossible to stop before running over them.

"After we got on the Texas Central main line I got on the east side of the corner of that tender on that stirrup, and I stayed there until just before the accident happened. When I got on the tender then there was nothing to obstruct my view down the track. I don't know as I could have seen these men if they were there if I had been looking. I was looking south down the track and I could not see them. I have good eyes. I testified from what I saw as to the switch stands. The men would be bigger than the switch stands. I did not see them.

"I was standing with both feet in the stirrup at the time I saw the men with both hands on the upright rod, and was looking south. I don't know whether if I could see those men on the track when 7 feet away. If I would turn around and take hold I would be looking right across the end of that tender. We don't ride that way. I had both feet in the stirrup and both hands on the upright rod looking south.

"I said at the time I holloed and jumped off the engine I was riding was going from 7 to

12 miles an hour. I holloed right when I jumped off and made the violent stop signal as I went off. I jumped off backwards. I did not fall down. I jumped kind of sideways.

"I testified in the other examination that I heard the air go into the emergency before we hit the men, and I testify to that now, and the men were 5 to 7 feet of the back end of the tender. When a man jumps from a train that is running along like that he would probably go 8 or 10 steps.

"These men at the time I saw them on the track seemed to be in close conversation, walking kind of slow with their heads kind of down and their backs kind of towards me. Now, as to why, if I did not see them walking up on the track, how it is that I could tell they were walking angling across the track, I saw them take two or three steps inside of the track. I did not see them take any steps outside of the rail. If I saw them take three steps that would be 9 feet. They were walking angling across the track on the inside of the rail. Now, as to whether, if I had been looking when I saw them three steps back up the track before we hit them, there would have been nothing to keep me from seeing them before that, I did not see them. No; there were no cars on the track. I was looking down the track and coming down towards these men; my eyes traveling over the territory that they were bound to have been on. I testified to that before. I do not say that I was looking right at the men. I did not see them. They did walk down the track a little bit angling. They came on the track kind of angling; that is correct. I testified also before that apparently they were going over to the car shed.

"I never did discover either one of these men before I saw them some 5 to 7 feet in front of the tender of the engine. I do not know from what direction they came to this place between the north lead and the Texas Central main line.

"Now, in riding those stirrups or steps I had my feet in the step and had my arm up this way (illustrating), holding onto the rod, I was then in a position to look down the track and also to look back to see the engineer. If there was any object or person just even with the tender's west side or a little south of the tender on which I would be riding that way, going in the direction we were going at that time, I could not have seen it because the tender was in the way, between me and any object immediately across from me. I don't know exactly how far ahead of the tender an object would have to be for me to see it between the Texas Central main line or on the Texas Central main line. I have never had an occasion to measure it; but when I first saw these men they were something like 5 to 7 feet ahead of the tender. * * * I heard the air go into emergency on my engine immediately. I leaped from my engine when I discovered the men on the track, and we were nearest switch stand No. 10, I think. The very moment I saw them I leaped from my place on the tender to the ground, giving the violent stop signal. When I leaped from the place I was a little bit south of the point where those men were struck. I knew that one had been dragged down the track. That is in evidence. When I leaped from my engine and holloed my engine was in motion, and as I leaped and holloed it continued in motion. Then when I heard the air go into emergency Mr. Mills and Mr. Gooch were not within my range of vision. I did not see them."

[2] The rule of law is well settled in this state that in order for a recovery to be had under the doctrine of discovered peril, which eliminates the defense of contributory negligence, it must be made to appear that the injured party was in a position of imminent danger, and that the defendant, or those acting for him, discovered the dangerous situation of the injured party in time to have averted the injury by the exercise of proper care. Texas & Pac. Ry. Co. v. Breadow, 90 Tex. 26, 36 S. W. 410; Morgan & Bros. v. M., K. & T. Ry. Co., 108 Tex. 331, 193 S. W. 134; Galveston Electric Co. v. Swank, 188 S. W. 705.

As stated before, no witness other than Cantrell testified to seeing either of the injured parties upon the track in front of the moving engine, though several other witnesses did testify to seeing them walking between that and another track; the space between the two tracks being about 15 feet. Counsel for appellees urge the contention that when Cantrell looked down the track all the time, as he testified that he did, he must have seen Gooch and Mills where the other witnesses saw them; and therefore, if the other witnesses referred to swore the truth, Cantrell swore falsely when he said he did not see the injured parties sooner than stated by him. But, if this be granted, it would merely prove that he saw them walking in the 15-foot space between the two tracks. That was a place of safety, and the mere fact that they may have been walking there would not have disclosed to Cantrell that they were in imminent danger. It is also contended that other facts and circumstances indicate that Mills and Gooch did not attempt to cross the track in question immediately in front of the approaching engine, but that they must have been on the track at a greater distance from the engine than that stated by Cantrell; and therefore, as he testified that he was watching the track all the time, he must have seen them and recognized their perilous situation. This evidence is too uncertain, and does not establish the fact that he could have seen them on the track and realized that they were in a perilous situation at such distance from the engine as to enable him, by the means at his command, to prevent the injury. Upon that issue the burden of proof rested upon the plaintiffs, and having failed to make such proof, the trial court should not have submitted that issue to the jury.

[3] It is strenuously insisted on behalf of appellant that the undisputed testimony shows that the deceased was guilty of contributory negligence, as a matter of law.

Acting upon that theory appellant requested a special instruction directing the jury to return a verdict for him, and the refusal of that instruction is assigned as error. We do not care to recite all the testimony bearing upon that question, nor to enter upon an extended discussion of it. It is sufficient to say that after a careful consideration of all the facts bearing upon the issues of negligence as charged against the defendant, and contributory negligence charged against the deceased, we have reached the conclusion that the trial court pursued the proper course when it submitted those issues to the jury.

[4] Some other questions are presented in appellant's brief, all of which are decided against him. Before concluding this opinion the writer deems it proper to direct attention to the fact that if the case had been tried upon special issues it may be that this court would affirm the judgment, notwithstanding the error concerning the question of discovered peril. In other words, if the trial court had submitted the case upon special issues, and the jury had made special findings to the effect, first, that the defendant was guilty of negligence, and, second, that the deceased was not guilty of contributory negligence, and had made a third finding in favor of plaintiffs on the issue of discovered peril, we might hold that the latter finding was immaterial, and affirm the judgment because of the, other findings of fact. But as the case was tried in the court below and resulted in a general verdict for the plaintiffs, and as it is impossible for us to know, or for the appellant to show, that the verdict was not based upon the theory of discovered peril, appellant is entitled to have the judgment reversed. Railway Co. v. Johnson, 91 Tex. 569, 44 S. W. 1067; Railway Co. v. Greenlee, 62 Tex. 349; Emerson v. Mills, 83 Tex. 388, 18 S. W. 805.

For the error indicated, the judgment of the trial court is reversed, and the cause remanded for another trial.

### Opinion on Motion for Rehearing.

Counsel for appellees have presented a motion for rehearing, accompanied by an able printed argument, all of which have been carefully considered by this court. However, we have reached the conclusion that we made the proper disposition of the case, and that the motion must be overruled. We deem it proper, however, to file an additional opinion relating to what seems to be the main points relied upon by appellees' counsel.

[5] It is urgently insisted that because appellant requested the court to give several instructions relating to the question of discovered peril it is estopped by what has been denominated "invited error," and should not be heard to complain because the court submitted to the jury the issue of discovered peril, and instructed them that contributory negligence was no defense against liability predicated upon the law of discovered peril.

Appellant requested the trial court to give six special charges, numbered 1 to 6, inclusive. No. 1 was a peremptory instruction, stating that the evidence was insufficient to warrant a verdict for the plaintiffs, and directing the jury to return a verdict for the defendant. All of the other charges requested by the defendant show upon their faces that they were subject to the action of the court in refusing to give the defendant's special charge No. 1. In other words, the record makes it clear that appellant did not intend to concede that there was testimony sufficient to authorize the court to submit to the jury any theory upon which a verdict against appellant could be predicated, and that all of the charges requested were based upon the theory that the court did not agree with appellant upon that subject, and appellant, in the event the question of discovered peril should be submitted to the jury, merely sought to have the views of its counsel upon the law of that question presented to them. The facts referred to do not disclose invited error. Patton v. Dallas Gas Co., 108 Tex. 321, 192 S. W. 1060.

We also overrule appellees' contention that appellant did not in the trial court object to the submission of the issue of discovered peril. Appellant filed written objections to the court's charge, in which the paragraph submitting that issue was objected to, among other reasons, as follows:

"And because all of the evidence in the record conclusively shows that the employés in charge of said engine did all that they could do to prevent the accident after discovering the peril. Therefore the issue as to whether Brakeman Jack Cantrell was negligent in failing to warn deceased, Ben F. Gooch, is clearly not raised, for the simple reason that the said Jack Cantrell gave a warning immediately upon discovering deceased, which fact is not disputed, and cannot in the very nature of things be disputed."

The document referred to assigned other reasons for objecting to that paragraph of the court's charge, predicated upon the idea that the evidence did not authorize the submission of that issue. That, in connection with appellant's request for an instructed verdict, was sufficient to preserve appellant's right to present the question in this court.

The third ground of the motion, which is urged with much force and confidence, embodies the contention that this court not only committed error when it held that the testimony did not raise the issue of discovered peril, but that in so holding it, in effect, overruled several appellate decisions in this state. That feature of the case has been carefully reconsidered, with the result that no sufficient reason has been shown or

found for changing the conclusion we reached upon that subject at the former hearing.

In support of their contention counsel have cited a number of Texas cases, three of which it is claimed are directly in point in appellees' favor.

The first case is I. & G. N. R. R. Co. v. Ploeger, 93 S. W. 226, and same volume (Sup.) 722. In that case the engineer in charge of the engine that injured Ploeger testified that when he first saw him he was going toward the track and stooped over in what the witness called a trot; that he was about 12 or 15 feet from the track, coming as though he was going across the track; and that he, the witness, thought Ploeger was going to try to cross the track, and hardly had time to do it, and that he applied the brake in the emergency with one hand and grabbed the whistle and blew it with the other. There was other testimony which justified the jury in finding that the engineer did not blow the whistle, or give any other signal, and doubtless it was upon that theory that the jury found for the plaintiff. At any rate, it was quite clear from the testimony given by the engineer himself that he realized the fact that Ploeger was about to go upon the track, where he would probably be injured, at a time when he was 12 or 15 feet from the track; and therefore the engineer's knowledge of Ploeger's perilous situation brought the case clearly within the doctrine of discovered peril.

The second case is H. & T. C. R. R. Co. v. Finn, 107 S. W. 94. In that case the plaintiff, Finn, was traveling in a space 10 feet in width between two railroad tracks in the city of Houston. He was not a trespasser, because the space referred to had been used so long by the public that it was known as "Railroad street"; and we quote, as follows, some of the facts disclosed by Mr. Justice Hodges, who wrote the opinion of the court:

"While the appellee was walking along in this space between the two tracks, a passenger train operated by the employés of the San Antonio & Aransas Pass Railroad Company was moving westward from the Central Depot towards Houston avenue, meeting the appellee. At the same time a switch engine with two loaded stock cars attached to its rear was backing up and approaching the appellee from his rear, going in the same direction that he was traveling. At or about the time the passenger train and the switch engine with the stock cars were passing each other, and at some point between Hickory and Oak streets, the appellee, having approached in close proximity to the southern track on which the switch engine was pushing the stock cars, and having his back toward the direction from which the switch engine was approaching, was struck on the shoulder by some portion of the forward car near its corner, and received the injuries for which he sued. The result of the collision was that he fell forward and outward from the cars to the ground on his face, so that no portion of his limbs or person was actually run over by the cars. He had not advanced sufficiently far to get on the track, but was merely within range of that part of the backing cars which extended over the rails. * * *

"While walking east between the two tracks he observed a passenger train on his left approaching him from the opposite direction, coming from the Central Depot; and when it got near him steam was being emitted from the cylinder cocks on the sides, and in order to avoid this steam as the engine approached he moved to the right, that is, towards the track on the south side, and about that time became unconscious. He learned afterwards that he had at that instant been struck by cars approaching him from behind on the southern track; that the passenger train while approaching and emitting steam made considerable noise, and this prevented him from hearing the noise of the cars that struck him. He also stated that after he passed between the tracks at about Hickory street he again looked backward to see if any cars were coming in his direction, and saw none. At the point where the accident occurred the two tracks were parallel and about 10 feet apart. He had walked beyond Hickory street when the collision occurred. He had walked all the way down to the point where he bore to the right to avoid the steam in the center of the space between the two tracks, and did this in order to avoid coming in contact with any moving train. At the time he diverged from this position to go around the steam coming from the passenger engine he did not halt, but kept moving on, and had no idea that any other train was coming in his rear. He heard no one halloo or give him any warning of the approach of a train, and his hearing at that time was good. His recollection as to whether he had gotten beyond the steam of the passenger engine when struck was not clear, but he thought the accident must have occurred immediately as he bore to the right to get out of the way, and while the steam was still upon him. A man on an engine or car could see him at the time he was struck a distance of three or four blocks in both directions. It was also admitted by attorneys for appellee that had he looked back he could have seen the approaching engine and cars that caused his injuries. The fact is undisputed that the train that struck the appellee was operated by the employés of the appellant, and consisted of two loaded stock cars and a switch engine, which were being backed down towards the Central Depot. Will Hellegeist, a witness for the appellee, testified: That at the time of the accident he was on the railroad track about 35 or 40 yards behind the appellee and west of him, and witnessed the collision. That appellee was walking in the space between the two tracks as the passenger train approached, emitting steam. That appellee moved to the right around the steam, and just as he did so the cars on the other track struck him and knocked him down. Both trains were then stopped. After both had stopped the forward end of the stock car that struck Finn and the passenger engine were between two and three cars apart; the latter having passed the stock car. That there was no obstruction to hinder the men on the car from seeing Finn, nor was there any to prevent Finn from seeing the approaching

car had he looked back. Jim Scott, a switch-man and witness for the appellant, testified: That he was on the top of one of the stock cars of the train that injured the appellee, and was on the end next to the switch engine as they were being backed down towards the Central Depot. That Butler Nance, a brakeman, and Mr. Crawford, the foreman, were standing on the top of the other car, which was in the lead toward the depot. While in this position, and just after passing Hickory street, he heard Nance halloo, 'Look out! look out!' and at the same time give a stop signal. Witness looked over the edge of the car to see the cause of this stop signal at this time, and discovered the appellee within 4 or 5 feet of the front end of the forward car, and immediately signaled the engineer to stop. The latter applied the air, and the cars were stopped within 25 or 30 feet, which was as short a distance as a stop could have been made, considering the rate of speed at which they were traveling. At that time they were going at about 5 or 6 miles per hour. He also stated that at the time he saw Finn and received the signals to stop the engine the passenger train on the other track had passed Finn and was about opposite the witness, and that no steam was then being emitted by the engine of the passenger train. He further admitted that a man walking down between those tracks, meeting an engine emitting steam, would be expected to bear away from the steam, and that he (witness) seeing one under those conditions would govern himself accordingly, and if he thought the man was unconscious of the approach of any cars in his rear, would take care to see that the man was advised in time to avoid injury, but that he would not expect the man to step over on the other track to avoid the steam."

As pointed out in that case, the jury had the right to find from testimony given by the plaintiff and one of his witnesses that the engine approaching him from the front was emitting steam, and that to escape from supposed injury by the steam he diverged so near the track on the other side that he was struck and injured by the train which was approaching from the rear; that the defendant's switchman, who was assisting in handling the train which caused the injury, saw the train in front, saw that it was emitting steam, and if he did so, then, according to his own testimony, he realized the fact that the plaintiff Finn would be expected to bear away from the steam, which would place him in proximity of the train approaching from the rear, and that he might be struck and injured by that train, unless something was done by those operating it to prevent that result. This shows that the brakeman Scott realized that Finn was in a perilous situation, and would probably do exactly what the testimony shows he did—diverge so far to the opposite side as caused him to be struck and injured by the train approaching him from the rear. Those facts brought that case clearly within the doctrine of discovered peril.

The third case is I. & G. N. R. R. Co. v. Tinon, 117 S W. 936. The following is quoted from that case:

"That appellant's line of railroad at the point where it crossed a public road ran north and south; that a public road running from west to east, at a point about identical with the west line of the right of way of the railroad, divided into two prongs, one of which extended east across the track of the railroad, and the other of which extended north along and parallel with the west boundary line of said right of way; that from the point where the public road crossed the railroad to a point south about 250 to 300 yards, where it curved to the west, the track of the railroad was straight and slightly upgrade; that for some distance west the public road as it approached the crossing over the railroad was also straight; and that between said public road as it so approached said crossing from the west and the right of way for the railroad south of the crossing was a field inclosed in part by a fence along the south line of the road and west line of the right of way. It further appeared from the evidence: That at about 9 o'clock on the morning of November 28, 1904, deceased and her sister Rose, then about 30 years of age, started to go afoot from a point on the public road west of the crossing to a point east of the crossing; that at the time the wind was blowing strongly from the south; that deceased was wearing a sunbonnet, which extended down and out, covering the sides of her head and face, and which was tied on to her head because of the wind; that her sister was wearing an ordinary hat pinned onto her head; that as they approached the crossing deceased and her sister, who had been jumping and skipping along the road, raced towards the crossing, the former being a short distance ahead of her sister; that at the same time appellant's north-bound passenger train was approaching the crossing at a speed of between 40 and 50 miles an hour, and making very little noise; and that deceased, as she reached the crossing, and while running across the same, was struck by the locomotive pulling the train and thereby instantly killed."

The deceased's sister testified that there was a man in the engine on the side next to her, and in discussing the question of discovered peril Chief Justice Willson said:

"We are of the opinion that the testimony referred to made it proper to submit to the jury as an issue in the case whether deceased's perilous position was discovered by the fireman or not, and if it was, whether or not it was discovered in time to have enabled him by the means at hand to have averted the injury resulting in her death. Had deceased known that the train was approaching, and that it was so close to the crossing, her position would not have been one of peril, for by stopping before she reached the crossing she could have effectually prevented injury to herself from the train. Her peril was due to her ignorance of the fact that the train was approaching and so close to the crossing. Railway Co. v. Finn (Tex. Civ. App.) 107 S. W. 99; Railway Co. v. Munn [46] Tex. Civ. App. [276], 102 S. W. 445; Railway Co. v. Ball, 96 Tex. 624, 75 S. W. 4. Is the evidence sufficient to support a finding that the

fireman discovered that she was so ignorant? The jury had a right to disbelieve the testimony of the fireman and the engineer that the former was engaged in firing the engine as they approached the crossing, and a right to believe the testimony of deceased's sister that a man was in the window on the fireman's side of the cab, and from her testimony infer that that man was the fireman. Railway Co. v. Craig, 35 Tex. Civ. App. 548, 80 S. W. 866; Brown v. Griffin, 71 Tex. 659, 9 S. W. 546; Railway Co. v. Ball, 96 Tex. 624, 75 S. W. 4; Railway Co. v. Finn (Tex. Civ. App.) 107 S. W. 94. They had a right to further infer, if the fireman was in a position to see deceased as she approached the crossing, that, in the discharge of his duty to keep a lookout for persons on the public road at or near the crossing, he did see her, and that, seeing her, he knew she was approaching the crossing from the west, on a run, at a time when a high wind then blowing was calculated to distract her senses of sight and hearing, already more or less impeded by a bonnet she was wearing, and apparently was oblivious to the fact that a swiftly and almost silently moving train, running behind its schedule time, was approaching the same crossing. If the jury might have found that the fireman knew so much, what deductions, if any, were they authorized to draw from such knowledge on his part? We believe they were authorized to infer that he knew that her intention might be to continue running and so pass over the crossing, that she at the time might be ignorant of the fact that the train was approaching and so near to the crossing, and that because of the bonnet she was wearing, the strongly blowing wind, the absence of noise in the movement of the train, and its rapid speed, she might not discover its approach in time to save herself from injury by it. If the jury might have inferred the fireman knew so much, then we think they might have concluded that he discovered before the train reached the crossing that deceased was in a position of peril from it."

The case at bar is not, in our opinion, analogous to either of the three cases referred to. The case was submitted to the jury upon the alleged negligence of the brakeman Cantrell, and it is not claimed that he knew anything about the unfortunate men who lost their lives on that occasion until they had crossed one track in front of an approaching engine, and were seen by two other witnesses walking between that track and the one upon which an engine was approaching from their rear. There is no satisfactory evidence showing that Gooch and Mills were not aware of the fact that the engine was approaching. They may have seen it as soon as they crossed the other track, and may have supposed that they could cross the track upon which it was traveling before it reached them, and may have attempted to do so without looking again. But be that as it may, if Cantrell discovered that they were about to attempt, or probably would attempt, to cross the track in front of the engine, and so near thereto as to endanger their lives, then it became his duty to exercise great care and

diligence to prevent such injury, and his failure to do so would render appellant liable, although Mills and Gooch may have been guilty of contributory negligence in going upon the track. The doctrine of liability for discovered peril, notwithstanding the contributory negligence of the injured party, is founded upon principles of humanity and public policy, "to prevent," as said by Mr. Justice Denman in T. & P. Ry. Co. v. Breadow, 90 Tex. 31, 36 S. W. 412, "what would otherwise be, as far as civil liability is concerned, the licensed destruction of persons negligently exposing themselves to peril." However, in that case, and as a part of the doctrine of discovered peril, the court said:

"If defendant, through the parties in charge of the engine, knew of Breadow's peril in time to have avoided same, such knowledge imposed upon it the new duty of using every means then within its power, consistent with the safety of the engine, to avoid running him down, and a failure so to do would render it liable, notwithstanding he may have been guilty of contributory negligence in being exposed to the peril. This new duty and liability for its breach is imposed, upon principles of humanity and public policy, to prevent what would otherwise be, as far as civil liability is concerned, the licensed destruction of persons negligently exposing themselves to peril. The same principle of law which, on grounds of public policy, will not permit a person to recover when his own negligence has proximately contributed to the injury, will not permit the party who has inflicted the injury in violation of such new duty to defend upon the ground of such negligence.

"The principle, however, has no application in the absence of actual knowledge, on the part of the person inflicting the injury, of the peril of the party injured, in time to avoid the injury by the use of the means and agencies then at hand. If he had no such knowledge the new duty was not imposed, though it be clear that by the exercise of reasonable care he might have acquired same. The burden of proof was upon plaintiff in this case, in order to recover for a breach of such new duty, to establish, not that the employés might by the exercise of reasonable care have acquired such knowledge, but that they actually possessed it."

In this case, where is the testimony that shows that Cantrell discovered that Mills and Gooch were in a perilous situation because of the approach of the engine upon which he was riding in time to have prevented or mitigated the catastrophe that resulted? Did the fact that they were walking diagonally along a space 15 feet in width between two railroad tracks necessarily indicate that they intended to cross the one toward which they were diverging without taking any steps to ascertain whether it would be safe to do so? A train was passing on the track they had just crossed, and even if they had intended to continue their journey down the 15-foot space without crossing the other track, it is but natural that in crossing the first track in

front of an approaching train they would diverge toward the other side of the 15-foot space. The railroad yard in question, like other railroad yards, had many different tracks, and persons who enter upon such yards are charged with knowledge that trains and engines may be moving on one or more of the tracks at any time, and such persons are supposed to have knowledge of such facts, and govern themselves accordingly.

Therefore it would seem unreasonable to hold that merely because persons are seen walking in a space between railroad tracks in a switch yard the employés engaged in moving cars and engines should assume that such persons will probably attempt to cross one of the tracks without first ascertaining whether it is safe to do so. So in this case it may be conceded that the testimony justified the jury in finding that Cantrell did not tell the truth when he said that he did not see Mills and Gooch, although he was looking in the direction where other witnesses saw them walking in the space between the two tracks; and while knowledge of that fact might show that Cantrell was guilty of negligence in failing to give such warnings as are usually sufficient to cause persons so situated to remain a safe distance from the track, still that fact did not bring home to him knowledge of the additional fact that they were about to attempt to cross the track in front of his engine. But appellees' counsel point to the fact that appellant's witness Trantham testified that he saw Mills and Gooch walking close to the track upon which appellant's engine was approaching; but he further stated that when he last saw them they were about 5 or 6 feet from that track. That statement explains what he meant by the use of the term "close to the track," or else it shows that while they may have "angled" some, as the witness said, toward that track, they had changed their course and gone back near the center of the space between the two tracks; and if Cantrell saw them all the time, as appellees' counsel claim he must have, then when they turned away from the track upon which his engine was traveling he would naturally suppose that they were not going to attempt to cross that track in front of the approaching engine. And while they were 5 or 6 feet from the track they may have suddenly turned and attempted to cross in front of and so near the approaching engine that it was impossible for Cantrell to do anything which would have averted the disaster, though he may have seen them turn and attempt to make such crossing.

The doctrine of discovered peril by which the defense of contributory negligence is nullified and rendered unavailing is predicated upon that principle of humanity and public policy which denies to any one protection from civil liability when he has intentionally or recklessly run down and injured a human being; and one may be guilty of ordinary negligence, as to which contributory negligence is a valid defense, without manifesting such intentional or reckless disregard of human life as would bring the transaction within the rule of discovered peril, and, in our judgment, this case comes within the rule of ordinary negligence and not that of discovered peril.

Motion overruled.