## BURLINGTON–ROCK ISLAND R. CO. et al. v. PRUITT et al.

### No. 2394.

Court of Civil Appeals of Texas. Waco.

March 12, 1942.

Rehearing Denied March 26, 1942.

Thompson & Barwise and Fred Korth, all of Fort Worth, and Geppert, Geppert & Victery, of Teague, for appellants.

L. W. Shepperd, of Groesbeck, and J. G. Anderson, of Fairfield, for appellees.

TIREY, Justice.

Plaintiffs brought this suit against defendants to recover damages for injuries resulting in the death of their fourteen year old son, Warren Pruitt, who was killed by one of defendants' trains. The action was grounded solely on the theory of discovered peril and was tried to a jury and a verdict was returned in favor of plaintiffs and the judgment followed the verdict.

The judgment is assailed on two grounds: (1) the court erred in refusing defendants' motion for an instructed verdict, because there was no evidence raising the issue of discovered peril; and (2) the court erred in refusing defendants' motion for judgment non obstante veredicto and in rendering judgment for plaintiffs on the jury verdict, because there was no evidence raising the issue of discovered peril.

The testimony adduced on discovered peril was substantially as follows: Warren Pruitt was run over by one of defendants' trains (southbound) near the south end of a trestle. The trestle was estimated to be from 400 to 500 feet long, but the height of the track from the ground at any point is not given. The plats offered in evidence show that the track runs in a northerly and southerly direction and is almost straight from the point of the accident and for some little distance north of the north end of the trestle, but the slight curve increases more sharply going north but the degree of the curve is not disclosed at any point. The plats do not show any whistle post or public crossing. There was about 100 feet open on each side of the track immediately north of the place of the accident; there were no bushes or trees on the right of way for a distance of three-fourths of a mile and one could see up and down the track from the creek bridge for such distance. One of the plats located the creek near the south end of the trestle and immediately near the point of the accident. Warren Pruitt lived with his father and mother in a house located east of the track and north of the accident. One of the plats shows the track down-grade at a point north of the Pruitt house, but neither the distance nor the degree of the grade is given. There was a road or pathway under the trestle for the convenience of the farm hands, but there was no public crossing. One witness estimated that the Pruitt home was 300 or 400 feet north of the north end of the trestle; that he looked at the south end of the trestle where Warren was killed and saw blood there and he estimated that Warren lacked 20 or 24 feet of being off of the trestle when he was killed.

The father of the deceased testified substantially that he was at home working on the garden fence on the day of the accident; the accident happened about 12:30 (noon) and he saw the motor passenger train of two coaches when it passed his house; "I heard it blowing and going on and did not pay much attention; I didn't see what it was blowing for"; that there was a whistle post about one-fourth of a mile north of his house; that the operator blew the whistle about even with his house but that there was no crossing or anything else to make it blow there and ordinarily the operator of the train did not blow the whistle there; that it was 300 or 400 yards from his house down to the trestle; that the train stopped after it got on the other side of the trestle—about 10 or 12 feet off of the bridge; that there is an open view from his house to the trestle of the track and right of way; it was "kind of" cloudy on the day of the accident; it was not wet underfoot and there was no water on the ground under the trestle at the point of the accident; that the trestle was at least 500 feet long. On cross-examination he testified that from the time he heard the train whistle, when it was opposite his house, until it came to a stop, it must have gone 700 or 800 feet; that after he heard the whistle opposite his house it was not long until he heard the second whistle, and he meant "in a second or two," and it continued to blow "for a good while until it crossed that bridge"; that he did not know the exact number of times he heard the whistle blow, but he heard it several times.

A half-sister of deceased testified substantially that she was at home in the kitchen on the day of the accident; she heard the whistle blow when it was about even with the house; that the whistle kept blowing and she went to the front and saw the train down near the trestle; it blew several times after it passed the house; it did not blow at the house every day, but it did blow sometimes if something was on the track.

The mother of deceased testified substantially that she was at home in the front room doing some patching when her attention was attracted for the first time by the blowing of the whistle when the train was even with her house; "I heard the train blowing at a place it had not been, and so many times I knew something was on the

track; I went to the door to see what it was"; it blew more than once or twice between the house and the trestle, but she did not know how many times it blew; it blew on the trestle, but she did not know what distance it was from the south end; the train did not blow opposite her house and from there to the trestle each day; the train slowed down near the end of the trestle. On cross-examination she testified that when she first saw the train "it * * * had not got quite to the trestle."

A half-brother of deceased testified substantially that he was sitting in a wagon in the field below and on the west side of the trestle waiting for Warren or his father to come back from dinner; his attention was first attracted to the train by the blowing of the whistle about the time it got on the trestle; if it blew before that time he did not hear it; at the time he heard the whistle blow "it was kind of dribbling and was not cutting off; it was almost straight along; I don't know whether it was on the bridge when it began. I am not sure it stopped just before it ran over him or as it was going over him. When I noticed him, he fell and it came on over the bridge." Referring to Warren, he said: "When I could see him I could not see the bridge all the way"; that he saw him before the train ran over him. (No other witness testified as to seeing Warren on the trestle.) He further testified: "I did not notice to see whether I could see the north end (referring to the trestle); I noticed where he was and running and fell"; he ran three steps; he did not know exactly where the train was when it started blowing; "Q. You are just guessing when you say it started (blowing) at the north end? A. I know from the way it was running, I am sure. I did not see it. I judged it to be there"; that there was no crossing at the north end of the trestle; and that the train came to a complete stop a few feet after it cleared the trestle. He further testified that it would be a dangerous risk for a man on the trestle to get down on the big piece of timber that was used as a cap or stringer for the bridge.

Defendants offered no evidence save and except a plat showing a portion of the track and right of way immediately north and south of the point of the accident. This plat was offered while plaintiffs were putting on their evidence and while defendants' counsel was interrogating plaintiff Felix Pruitt on cross-examination; and when plaintiffs rested, defendants rested.

■ Defendants' first proposition is that "the evidence was wholly insufficient to show that the defendants' train crew, whether one or more, discovered the perilous position of the deceased in sufficient time to have avoided injuring or killing him by the use of all the means at their command consistent with their own safety and the safety of the passengers on the train." We sustain this contention. "The doctrine of discovered peril involves three elements, viz.: (1) The exposed condition brought about by the negligence of the plaintiff; (2) the actual discovery by defendant's agents of his perilous situation in time to have averted—by the use of all the means at their command, commensurate with their own safety—injury to him; and (3) the failure thereafter to use such means." Baker v. Shafter, Tex.Com.App., 231 S.W. 349, 350; Turner v. Texas Co., Tex.Com.App., 159 S.W.2d 112.

■ We think the evidence is sufficient to sustain the inference that the operator discovered the presence of Warren Pruitt on the trestle before the accident. The question then arises: When did the operator of the train realize that Warren Pruitt was in a perilous position? The evidence is that the trestle was some 400 to 500 feet long. The testimony varies as to the distance from the north end of the trestle to a point on the track about opposite the Pruitt home. One witness estimated that it was 300 or 400 feet; another witness estimated that it was 300 to 400 yards, and that the train, from the time it began whistling until it stopped, must have traveled some 700 or 800 feet. One witness said that when he saw Warren, Warren was running and took only three steps before he was run over by the train; and the evidence is that Warren was run over some 20 or 24 feet north of the south end of the trestle. If the jury believed the trestle was, in fact, 500 feet long and that the distance from the north end of the trestle to a point on the track opposite the Pruitt home was 400 yards (the highest estimates made), did the jury have the right to infer that the operator of the train realized the perilous position of Warren when the train was opposite the Pruitt house, or at any other point on the track, without having any evidence as to the rate of speed of the train and without any evidence as to the

distance required to stop the train, traveling at such speed, by the use of all the means at hand? We think not. Did the jury have the right to make such inference if they believed that the length of the trestle was 400 feet and that the distance from the north end of the trestle to a point on the track opposite the Pruitt home was 300 feet (the lowest estimates made)? We think not. Moreover, at just what point on the trestle was Warren when the operator of the train realized Warren's perilous position and what distance was the train from Warren at such time, and at what rate of speed was the train traveling and in what distance could the train have been stopped by the use of the means at hand, consistent with the safety of the operator and passengers? We think there is an absence of evidence on these vital matters. The doctrine of discovered peril "has no application in the absence of actual knowledge, on the part of the person inflicting the injury, of the peril of the party injured in time to avoid the injury by the use of the means and agencies then at hand. If he had no such knowledge, the new duty was not imposed, though it be clear that by the exercise of reasonable care he might have acquired same. The burden of proof was upon plaintiff in this case, in order to recover for a breach of such new duty, to establish, not that the employés might, by the exercise of reasonable care, have acquired such knowledge, but that they actually possessed it." Texas & P. R. Co. v. Breadow, 90 Tex. 26, 36 S.W. 410, 412; Schaff v. Gooch, Tex.Civ.App., 218 S.W. 783, point 2 on page 787, writ dismissed. We think the plaintiffs failed to carry this burden. Now it is true that Warren's half-brother saw the train about the time it came on the trestle, and when he saw Warren, Warren was running and took only three steps before he fell, but there is no evidence as to just where Warren was on the trestle, or as to what he was doing, when the train was opposite the Pruitt home (if the jury could infer from the evidence that Warren was on the trestle at that particular time), or at any subsequent time except as above stated. The evidence further shows that the train consisted of two coaches, but their length is not shown. There is evidence that the train slowed down after it got on the trestle, but there is no evidence at what point on the trestle the train began to slow down, or as to its rate of speed before or after it slowed down. The evidence does show that the train ran over Warren some 20 or 24 feet north of the south end of the trestle and that it ran this distance, plus the distance of the length of the train, plus the distance of the 10 or 12 feet it ran in clearing the trestle, before coming to a complete stop. The question then arises: Where is the evidence to sustain the jury's finding that the operator of the train, after discovering Warren Pruitt in a perilous position on the trestle, realized that Warren would not likely remove himself from danger in time to avoid injury? We fail to find it. Likewise, where is the evidence to sustain the jury's finding that said operator made the discovery of the perilous position of Warren in time, by the exercise of ordinary care in the use of the means at hand, to have avoided killing Warren Pruitt? We fail to find such evidence.

■■ It is well settled that discovered peril may be shown by circumstantial evidence (Texas & N. O. R. Co. v. Goodwin, Tex.Civ.App., 40 S.W.2d 182, points 6-8 on page 188), but that does not mean that one presumption can be made to rest upon another presumption. But are the circumstances in proof attending this accident sufficient to support an inference that the operator had actual knowledge of the peril of Warren in time to avoid the injury by the use of the means and agencies then at hand, or that the operator failed to do all that he should have done after realizing that Warren would not extricate himself from his perilous position? We think not. "Whenever circumstantial evidence is relied upon to prove a fact, the circumstances must be proved, and not themselves presumed. No presumption can be drawn from a presumption. If there be no fixed or ascertained fact from which the inference of another fact may be drawn, the law permits none to be drawn from it." Parks v. St. Louis Southwestern R. Co., 29 Tex.Civ.App. 551, 69 S.W. 125, point on page 127. See, also, Shifflet v. St. Louis S. W. Ry. Co., 18 Tex.Civ.App. 57, 44 S.W. 918; Missouri Pacific R. Co. v. Porter, 73 Tex. 304, 11 S.W. 324. We think the evidence wholly fails to sustain elements Nos. 2 and 3 of the doctrine of discovered peril as outlined in Baker v. Shafter, supra.

■ We have carefully considered this record and we feel that we cannot say that this case has been fully developed and, for that reason, the case will be remanded in-

stead of rendered. Lanford v. Smith, 128 Tex. 373, 99 S.W.2d 593, pars. 3-4, on page 594.

The judgment of the trial court is reversed and the cause is remanded.