## THOMAS v. MISSOURI–KANSAS–TEXAS R. CO. OF TEXAS.

### No. 11609.

Court of Civil Appeals of Texas. Galveston. March 1, 1944.

Rehearing Denied March 23, 1944.

Allen, Helm & Jones, of Houston (J. Edwin Smith, of Houston, of counsel), for appellant.

Tom M. Davis, of Houston (Baker, Botts, Andrews & Wharton, of Houston, of counsel), for appellee.

MONTEITH, Chief Justice.

This action was brought by Marilla Thomas, a widow, as administratrix of the estate of her deceased husband, Fred Thomas, under the provisions of the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq., to recover damages growing out of the death of her said husband alleged to have been caused by the negligence of appellee, Missouri-Kansas-Texas Railroad Company of Texas, in failing to have available safety devices to protect the deceased while employed by appellee in removing débris from a trestle under one of its bridges.

Appellee answered by general denial and by allegations of various acts of contribu-. tory negligence on the part of the deceased, claimed by it to have been the sole and proximate cause of Fred Thomas' death, and by a plea of unavoidable accident.

At the conclusion of all the evidence the court granted the appellee's motion for an instructed verdict and entered judgment for appellee.

Appellant's husband, Fred Thomas, was drowned on July 10, 1942, while working with a section gang removing driftwood and débris which had accumulated on the north or upstream side of a trestle of one of appellee's bridges crossing White Oak Bayou in the City of Houston.

The drift pile was surrounded by water which had backed up behind the trestle and ran around its east and west sides. It formed a comparatively quiet back water immediately south of the drift, but became swift at a point a short distance down stream where the two currents converged. On the west side of the drift the water was

shallow. There were planks leading from both the east and the west side of the drift pile to the banks of the bayou which were used by the men when they went to and came from lunch and work. The record shows that on the occasion in question all of the men employed, except Thomas, who had gone to work that day and a fellow-workman, Martin Parker, used these planks to leave the drift pile which was at that time solid and easy to walk upon. At about fifteen minutes to five on that afternoon, the section foreman, Mr. Wells, called to the men from the top of the bridge that it was time to quit and instructed them to go to the tool house and knock off for the day. Mr. Wells testified that a short time after he had told the men to quit and after they had begun to get out he heard some one "hollering for help." He testified that he could not say how much time had elapsed between the time he told them to quit and the time he heard the call for help, but that it did not seem long, "a minute or so, I guess. Just a short time."

All of the men in the crew were present when Thomas was drowned and all of them, except four, three Mexicans and a white man, who were not employed at the time of the trial, testified at the trial of the case. Two witnesses, Alsworth Newsome and Martin Parker, testified that they actually saw Fred Thomas enter the water. One witness, John Ambrose testified that he heard Fred Thomas say that he was going swimming, and both he and another witness, Tommie Miles, testified that they heard Fred Thomas warned not to get out into the water. The record shows that no one else had any conversation with Fred Thomas and no one else testified as to how he got into the water.

The witness, Elsworth Newsome, who was not employed by appellee at the time of the trial, testified, in substance, that the foreman, Mr. Wells, told the men to come out, that it was knocking off time, and that they all started out and that Martin Parker said, "I am going to swim out", and jumped off into the bayou, and that Fred Thomas said he was going to swim out too, and that Parker told him "If you can't swim do not try to follow me. This water is pretty swift", and that Thomas had said, "I can swim". Newsome testified that Fred Thomas handed his tools to him and jumped off into the water and that he started off swimming a little but went down and came up and "hollered" for help. He testified that he was looking at him at the time he

jumped into the water to see how he was going to make it out and that he did not make it out.

Martin Parker testified, in substance, that the deceased had told him that he was going to swim out and had jumped off into the water. He testified that he had told Thomas that it was dangerous out there, but that Thomas said he could swim but that he got in the swift water and the current carried him out. He stated that he knew Thomas was in trouble because he "hollered" for help; that he had tried to help him but that he got tangled up in some vines. On cross-examination, Martin Parker testified that Fred Thomas was standing by the piling and that he "jumped off into the water swimming". He stated that he saw Thomas swim, that "he jumped in right at the drift pile" when the foreman told the men to knock off; that he he had watched Thomas jump off and that he was looking at him at the time.

On re-direct examination, Martin Parker testified that he asked Fred Thomas if he could swim and that he had answered that he could.

Appellant contends that the record shows that Thomas could not swim. There is no direct evidence in the record that Fred Thomas could not swim. There was testimony by appellant's witness, Pete Wilson, that, on two occasions during his seven years acquaintance with Fred Thomas, he had gone with him to rivers or swimming pools where every one else went swimming and that Thomas did not go in swimming on either occasion. Fred Thomas had on the clothes in which he was working at the time he was drowned.

The controlling question presented in the appeal is whether a fact issue was raised for the jury's determination as to whether Fred Thomas accidentally slipped and fell or was knocked into the water and was drowned. Appellant relies entirely upon circumstantial evidence to establish these facts.

While it is the settled law in this State that a cause of action based on negligence may be established by circumstantial evidence, it has been uniformly held that whenever circumstantial evidence is relied upon to prove a fact, the circumstances themselves upon which the presumption is based must be proved, and not presumed, since no presumption can be drawn from a presumption, and if there is no fixed or ascertained fact from which the inference

of another fact may be drawn, the law does not permit one to be drawn from it. Federal Underwriters Exchange v. Hightower, Tex.Civ.App., 161 S.W.2d 338, writ of error refused; Green v. Texas & Pacific R. Co., 125 Tex. 168, 81 S.W.2d 669; McCrory's Stores Corp. v. Murphy, Tex.Civ. App., 164 S.W.2d 735; Burlington-Rock Island R. Co. v. Pruitt, Tex.Civ.App., 160 S.W.2d 105; Texas & N. O. Ry. Co. v. Warden, 125 Tex. 193, 78 S.W.2d 164.

Volume 17, Texas Jurisprudence, page 909, lays down the following rule in reference to the sufficiency of circumstantial evidence to establish a given fact: "The circumstances relied upon must be proved by direct evidence; they may not, it seems, exist merely by inference or presumption. No safe conclusion, so it is said, can be deduced from circumstantial evidence if it be left reasonable to suppose that the circumstances themselves are not proven."

In 17 Texas Jurisprudence, page 247, § 57, it is said:

"Inference can never be made to subserve the primary function of evidence, and no inference of fact should be drawn from an uncertain premise. The fact or facts relied on to support a presumption or inference must be proved by direct evidence the same as if they were in issue. A presumption of fact cannot rest upon a fact presumed, or, in other words, one presumption cannot be based upon another presumption, nor an inference of fact upon other inferences."

The above rule is aptly illustrated in the case of Empire Gas & Fuel Co. v. Muegge, 135 Tex. 520, 143 S.W.2d 763, 767. In that case, Judge Smedley, in discussing the weight to be given issues of fact when based upon presumptions, said: "It is settled in this state, and by weight of authority elsewhere, that such presumption is not evidence, but rather a rule of procedure or an 'administrative assumption' which 'vanishes' or is 'put to flight' when positive evidence * * * is introduced. * * * It is not evidence and when met by rebutting proof is not to be weighed by the jury or treated by the jury as evidence in arriving at a verdict."

The following authorities are in accord with the rule of law above outlined; Houston News Co. v. Shavers, Tex.Civ.App., 64 S.W.2d 384, writ of error refused; Crabb v. Zanes Freight Agency, Tex.Civ.App., 123 S.W.2d 752.

In the instant case there is clear, positive and undisputed evidence that Thomas intentionally entered the water to go swimming. Therefore, there is, we think, no basis for a presumption that he slipped or fell or was knocked into the water, even if that conclusion did not rest upon facts inferred from facts presumed.

Applying the above authorities to the facts in the instant case, we think that the jury could have concluded that appellee's negligence, if any, was the proximate cause of Fred Thomas' death only by disregarding the undisputed evidence of how he met his death and by thereafter basing presumptions on speculation and conjecture.

The courts of this State have uniformly held that, where the evidence on the essential facts in a case is such that reasonable minds can not differ as to its verity and inference, a question of law is then presented and it is the duty of the trial court to instruct a verdict and enter judgment upon such undisputed facts, as was done in the instant case. May v. Donalson, Tex.Civ.App., 141 S.W.2d 702; Lewis et al. v. Clark, Tex.Civ.App., 149 S.W.2d 244; Kirby Lumber Co. v. Temple Lumber Co., 125 Tex. 284, 83 S.W.2d 638; 41 Tex.Jur., page 939, section 169. The judgment of the trial court is in all things affirmed.

Affirmed.