## LEWIS et al. v. CLARK.

### No. 10847.

Court of Civil Appeals of Texas. San Antonio.

Feb. 5, 1941.

Rehearing Denied April 2, 1941.

Wagner & Wagner and A. Milton Vance, all of Houston, and Dean B. Kirkham, of Corpus Christi, for appellants.

Sidney P. Chandler, of Corpus Christi, for appellee.

NORVELL, Justice.

This is an action for damages based upon an alleged conversion of certain tubing, casing, oil well tanks and equipment, located on an oil and gas lease. The controlling issue is one of title. Trial was to a jury and judgment rendered thereon in favor of appellee, G. C. Clark, against appellants, Coast Operating Company (a co-partnership composed of S. C. Lewis, H. E. DeLee and S. C. Lewis, Jr.), Houston National Bank of Houston, Texas, and Meyer C. Wagner, trustee.

Appellants' first proposition asserts that the judgment of the trial court must be reversed as the record shows as a matter of law that the title to the property involved was vested in Coast Operating Company at the time of the alleged conversion.

Appellee claims to have acquired title to the property under an agreement of purchase from one J. B. Salmon. He also claims that he became the owner of said property by forfeiture; i. e., that said property was not removed from his lands within a reasonable time after the termination of the oil and gas lease hereinafter mentioned.

The record in the case is very voluminous, and no useful purpose would be served by an extensive discussion of the facts nor the multitudinous contentions of the parties. This case was before this court upon an appeal from a temporary injunction, and our opinion is reported in 129 S.W.2d 421. The facts and circumstances, stated briefly, which we regard as controlling are:

On January 21, 1936, appellee, Clark, and wife, as lessors, executed an oil and gas lease to S. M. Lippard covering certain lots in the City of Corpus Christi, Texas. The term was for one year and as long thereafter as oil or gas was produced in paying quantities. On March 4, 1936, Lippard and R. Y. Walker, as joint operators of the lease, entered into an agreement with J. B. Salmon whereby Salmon agreed to finance drilling operations thereon in consideration of an oil payment which was to terminate when the amount advanced had been repaid. Salmon also received an assignment of a portion of the working interest of the lease. Lippard thereafter assigned the lease to R. Y. Walker. Walker in turn assigned various portions of the working interest of the leasehold to several individuals. About the eighth day of April, 1936, Walker executed assignments of the lease to J. B. Salmon. These assignments, however, specifically referred to the agreement of March 4, 1936.

On May 11, 1936, Lippard, Walker, Salmon and W. H. Harrison entered into a further agreement which recited that Salmon held title for the benefit of the various holders of portions of the working interest under the lease. Although this instrument possessed some of the characteristics of a trust agreement, its legal effect was actually to vest or confirm the title to various portions of the working interest in the contracting parties and others named in the instrument. To a certain extent it had the effect of abrogating the prior assignment to Salmon, and was a substantial modification thereof. In this instrument no reference was made to tubing, casing, oil well tanks and other equipment (referred to in the briefs as "trade fixtures"), nor to personal property used in connection with the lease. The assignment to Salmon did refer to and purport to convey "all personal property used or obtained in connection" with the lease.

At the time of the execution of the assignment to Salmon, a drilling rig was on the lease, but the trade fixtures here involved had not been placed thereon.

About October 1, 1936, Harrison purchased Walker's interest in the lease. An assignment was executed from Walker to Harrison which did not specifically describe the trade fixtures here involved, but

Harrison testified fully as to the terms of this transaction with Walker. This testimony was not contradicted in any way, and it appears conclusively that it was the intention of the parties that Harrison should receive the personal property used in connection with the lease. As the trade fixtures then on the lease were personal property, an instrument in writing was not necessary to effect a valid transfer of Walker's interest. 20 Tex.Jur. 218.

■■■■ The evidence, including the written instruments above mentioned, to our minds clearly shows that Walker and Harrison, and then Harrison alone (after he had purchased Walker's interest) were the operators of the lease and owners of the trade fixtures used in connection therewith. They seem to have so been recognized by the Railroad Commission as well as all parties interested in the development of the lease. Although Salmon advanced the money to drill the lease, such advancements were made under the agreement above mentioned, whereby he was to be repaid out of oil produced as a result of drilling operations, and was to receive a certain portion of the working interest in the leasehold estate. He received no interest in the trade fixtures used in connection with the development of the lease. It follows that appellee could not have acquired title to the trade fixtures involved from Salmon, who had no title. We are of the further opinion that the agreement of purchase between appellee and Salmon under which appellee claims, was conditional in that it became effective only upon a contingency which never transpired, and for this reason also appellee's claim under Salmon can not be upheld.

Appellants assert that on the date of the alleged conversions, Coast Operating Company was the owner of the trade fixtures involved as Harrison, on November 25, 1936, executed a deed of trust and chattel mortgage to Meyer C. Wagner, trustee for the benefit of the Houston National Bank, to secure a total indebtedness of $55,000. This mortgage covered Harrison's interest in the Clark lease, as well as all "his personal property, boilers, pipes, engines, connections, casings and equipment, * * * upon, connected with or appurtenant to the leasehold * * * now situated thereon, or which may hereafter be placed thereon."

Harrison defaulted in payment and on August 2, 1938, Wagner, as trustee, sold and conveyed the property covered by said mortgage or deed of trust to the Houston bank.

On August 17, 1938, the bank conveyed the property to H. N. B. H. Corporation, and on January 25, 1939, this corporation conveyed to Coast Operating Company the trade fixtures here involved.

On February 4, 1939, the Coast Operating Company attempted to remove the trade fixtures here involved, but were enjoined by order of the district court. This injunction was dissolved by this court. See 129 S.W.2d 421, and on the day the opinion of this court was handed down, May 10, 1939, the Coast Operating Company removed certain of the trade fixtures from the premises, and then on August 1, 1939, the balance of the fixtures were removed. These removals are the basis of appellee's claims of conversion.

It will be seen that Coast Operating Company exhibited a regular chain of title from Harrison and as appellee's claim under Salmon can not be sustained, the judgment appealed from must be reversed unless appellee's theory of title by forfeiture be upheld.

The evidence shows that three producing wells were drilled upon the lease, but that by September 1, 1937, very little or no production was being obtained. It is indicated that the lack of substantial production was due to a failure of gas pressure in the wells.

Appellee claims ownership of the property here involved under the provisions of the original lease, which he executed to Lippard and also under a surface lease which he had with Harrison.

The oil and gas lease provided that: "Lessee shall have the right at any time during or after the expiration of this lease to remove all property and fixtures placed by lessee on said land, including the right to draw and remove all casing."

The surface lease was dated May 2, 1936, and its applicability to the trade fixtures involved is not clear.

Said lease contained the following provisions:

"The lessees may remove any and all such improvements so placed upon said land within a reasonable time after the termination of this lease, and provided further that this lease shall terminate within a reasonable time after production of oil or gas in paying quantities from and under said land shall cease, if such production.

ceases prior to said two-year period (the term of the lease).

\* \* \* \* \* \*

"The lessees covenant and agree to and with the lessor that upon the termination of this lease, whether by lapse of time, or any other conditions or provisions contained herein, the lessees will peaceably and quietly yield up and surrender the leased premises, removing their improvements therefrom within a reasonable time, and upon the failure to remove such improvements within a reasonable time, it shall be considered that the lessees have abandoned same, and such improvements shall become a part and parcel of said land."

If it be considered that the surface lease did apply to the trade fixtures as well as buildings constructed on the surface in connection with the operations on the property, the legal situation involved is not changed in any way, for the reasons hereinafter stated.

Appellant contends that the oil and gas lease terminated on September 1, 1937 (this is doubtful but may be conceded for the present purposes), and that sixty days was a reasonable time for Harrison or those holding under him to have removed the trade fixtures. The jury found that the trade fixtures were not removed within a reasonable time after it was determined that neither oil nor gas could be secured from the wells on the lease (September 1, 1937).

A reasonable time was defined as: "such length of time as may fairly and properly and reasonably be allowed or required, having regard to the nature of the act or duty and to the attending circumstances; that time which as rational men the parties to a contract ought to have understood each other to have in mind; that time which preserves to each party the rights and advantages he possesses and protects each party from losses that he ought not to suffer."

Bearing upon the issue of "a reasonable time," the following facts are pertinent: On August 31, 1937, the appellee joined with others in filing a petition in the State District Court requesting that a receiver be appointed for W. H. Harrison, Inc., and for the properties of W. H. Harrison, individually, which were used in connection with the drilling and producing of oil. On September 7, 1937, said court appointed a receiver, as prayed for, and six days later appointed a successor to the original receiver. On September 16, 1937, in Bankruptcy Cause No. 395, styled "In the Matter of W. H. Harrison, Inc., Debtor" (a 77 B proceeding 11 U.S.C.A., Sec. 207), pending in the United States District Court for the Southern District of Texas, Corpus Christi Division, an order was entered directing the temporary trustee to apply to the State District Court for an order directing the receiver appointed by the State Court to turn over the property held by him under such appointment to the federal trustee. The requested order was issued by the state court the following day.

By order dated March 4, 1938, entered in Bankruptcy Cause No. 397, pending in the federal District Court, W. H. Harrison was adjudicated a bankrupt, as of October 1, 1937, and on May 26, 1938, the federal court ordered the trustee in bankruptcy to abandon all further claim in and to the oil and gas leasehold estate owned by the bankrupt, together with all personal property used in connection therewith, upon a finding that such property was encumbered with liens in excess of its value, and was otherwise unprofitable to the bankrupt estate.

After the entry of the abandonment order, the Houston Bank proceeded with the foreclosure of its lien as hereinabove set out.

It appears that at the time the State receivership suit was filed against him, Harrison was attempting to drill a gas well off the Clark lease in order to obtain gas with which to jet the wells situated upon said lease and thereby increase or bring back production. It further appears that the federal trustees also made attempts to increase or bring back production. In June and July, 1938, Meyer C. Wagner, as trustee under the Harrison mortgage and deed of trust, as authorized therein, caused well No. 1, on the Clark lease, to be reworked and jetting operations continued. These attempts at production were continued by the H. N. B. H. Corporation.

Appellee, in support of his theory of forfeiture, cites the following authorities: Terry v. Crosswy, Tex.Civ.App., 264 S.W. 718; Armstrong v. Federal Supply Co., Tex.Civ.App., 17 S.W.2d 170, and Meers v. Frick-Reid Supply Corporation, Tex.Civ. App., 127 S.W.2d 493.

In the first case mentioned, the Beaumont Court of Civil Appeals in construing a provision in an oil and gas lease with

reference to the right of removal of trade fixtures similar to the one here involved held that the failure to remove trade fixtures within a reasonable time resulted in a forfeiture, making them a part of the realty and vesting the owner of the fee with title thereto (loc. cit. 264 S.W. 720).

If we accept this construction of the provision of the oil and gas lease, it will be noted that it is similar to the express provisions in the so-called surface lease, in that both the oil and gas lease and the surface lease provide for a forfeiture. It is of course well settled that "forfeitures are looked upon with disfavor by the courts, and that the party to a contract claiming the benefit of a forfeiture clause must clearly show that the contract has been breached by the other party in the particular manner providing for a forfeiture." Gulf Production Co. v. Cruse, Tex.Com.App., 271 S.W. 886.

In Armstrong v. Federal Supply Co., supra [17 S.W.2d 171], the Waco Court of Civil Appeals discusses the meaning of the term "a reasonable time" with reference to the right of removal of trade fixtures after an oil and gas lease has expired. The definition of "a reasonable time" given in 33 Cyc. pp. 1567, 1568, is approved, and is the definition hereinabove quoted.

In Meers v. Frick-Reid Supply Company, supra [127 S.W.2d 497], the court said: "That which constitutes a reasonable time is a question of fact or, at least, a mixed question of law and fact and depends upon the circumstances surrounding the case to which the principle is sought to be applied. What would be a reasonable time in one case might be wholly inadequate to shut off the rights of parties in a different case or under different circumstances. Armstrong v. Federal Supply Co., supra; Houston & T. C. R. Co. et al. v. Roberts, 101 Tex. 418, 108 S.W. 808."

However, it is well settled that "when the evidence is such that reasonable minds cannot differ as to its verity and inference" a question of law is presented. Kirby Lumber Co. v. Temple Lumber Co., 125 Tex. 284, 83 S.W.2d 638, 642; Joske v. Irvine, 91 Tex. 574, 44 S.W. 1059; 41 Tex.Jur. 939, Sec. 169.

Looking to all the circumstances of this case, as above set out, we hold as a matter of law under the rule above stated, that the trade fixtures involved were removed from the premises within a "rea-

sonable time," and that no forfeiture occurred. The finding of the jury upon this issue is without support in the evidence. Appellants' first proposition is sustained. To hold otherwise would be to enforce a forfeiture, harsh in operation which has no basis in law, and ignore the definition of "a reasonable time," which is set out in the Armstrong case, supra.

We also hold that the evidence is insufficient to show that the Houston Bank or Meyer C. Wagner, trustee, was guilty of conversion, even if it should be considered that appellee was the owner of the disputed property when it was removed from the premises by the Coast Operating Company. What has been said disposes of all issues before this court. Under this record it is our duty to reverse the judgment of the trial court, and here render judgment that appellee take nothing. It is accordingly so ordered.

Reversed and rendered.