**SMITH DEVELOPMENT COMPANY, Appellant,**

v.

**J. M. DWIGHT, Jr., Appellee.**

No. 14994.

Court of Civil Appeals of Texas, San Antonio.

Sept. 8, 1971.

Rehearing Denied Oct. 6, 1971.

S. Tom Morris, Gibson, Ochsner, Adkins, Harlan & Hankins, Amarillo, for appellant.

Robert Mitchell, A. L. Hernden, San Antonio, for appellee.

KLINGEMAN, Justice.

Plaintiff, J. M. Dwight, Jr., sued Smith Development Company for breach of a written contract dated September 3, 1968, in which contract plaintiff agreed to perform for defendant a gamma ray survey on approximately 10,240 acres of land in New Mexico for a fixed price of $9,000.00 (15 days at $600.00 per day). Plaintiff alleged that he performed such work in accordance with such contract, and that defendant had refused to pay him for such work. Trial was to a jury which found that: (1) the parties entered into a written contract on September 3, 1968; (2) plaintiff performed the services called for in the contract; (3) plaintiff performed such services within a reasonable time; (4) plaintiff returned a signed copy of the contract to defendant prior to January 21, 1969; (5) plaintiff returned a signed copy of the contract to defendant on September 14, 1968; and (6) plaintiff returned a signed copy of such contract to defendant within a reasonable time. Judgment was entered for plaintiff in the sum of $9,000.-00.

Defendant asserts sixteen points of error which basically present three propositions:

(1) Whether there was an effective contract between the parties.

(2) Whether plaintiff performed the services called for in the alleged contract at all, or within a reasonable time.

(3) Whether there is a fatal conflict between Special Issue No. 1 and Special Issue No. 5.

Defendant's Points of Error Nos. 1 through 9 pertain to the making of the contract and will be discussed together. By such points defendant asserts that there is no evidence that an effective contract ever came into being, and that the evidence and plaintiff's admissions show as a matter of law that there was no effective contract between the parties; that there is no evidence to support the jury's answer to Special Issues Nos. 1, 4, 5 and 6;[1] and that the jury's answers thereto are against the great weight and preponderance of the evidence.

Defendant does not here contend that the contract involved was not signed by both plaintiff and defendant, but it asserts that there never was an effective contract between the parties because plaintiff did not accept defendant's offer within the time or manner, or upon the terms specified by defendant, or within a reasonable time.

The record reveals that the contracts involved and signed by James F. Smith, Jr., on behalf of defendant, were sent to plaintiff by mail on April 5, 1968, the pertinent parts of the letter of transmittal stating:

"We enclose herewith both copies of the 'gamma ray survey' contract as executed

---

1. Special Issue No. 1: That plaintiff and defendant entered into a contract on September 3, 1968.

Special Issue No. 4: That plaintiff returned a signed copy of the contract to defendant prior to January 21, 1969.

Special Issue No. 5: That plaintiff returned a signed copy of such contract to defendant on September 14, 1968.

Special Issue No. 6: That plaintiff returned a signed copy of such contract within a reasonable time.

by Jim Smith, Jr. Will you please sign both copies, date them the day you sign, and return the original to Jim here in Amarillo.

"As to the date of commencement, I suggest that you fill in April 30, 1968 in the event some unexpected delay as to the title should come up. However, as discussed on the phone, it is hoped that you can commence by April 15."

Plaintiff testified that after receiving such contracts from defendant, he was requested by defendant to delay execution pending the processing of an OME loan and the checking of title of the New Mexico property, and these matters caused a delay of several months; but that finally some time in August or early September, he received a call from Smith in which Smith advised him that the title had finally been cleared, and that they were ready to proceed with the gamma ray survey; whereupon he filled in the blanks in the contract, dated it, signed it, and mailed the original to defendant in Amarillo in the early part of September, 1968.

Defendant acknowledges that this testimony standing alone would raise an issue of fact as to whether or not the contract was signed by plaintiff and returned within a reasonable time, and further acknowledges that it might be sufficient to raise an issue as to whether the contract was entered into on September 3, 1968, since plaintiff also testified that he thought he dated the contract the day he signed it and then mailed it to Amarillo. Defendant asserts, however, that the effect of such testimony is destroyed by plaintiff's own unqualified and binding admissions. In this connection defendant relies on plaintiff's testimony that there were only two copies (duplicate originals) of the contract sent by defendant to plaintiff on April 5, 1968; that one of such copies was signed by plaintiff and retained for his files and in-

troduced into evidence in this case as plaintiff's Exhibit No. 1; that a second copy was mailed to defendant by plaintiff together with plaintiff's letter of January 21, 1969, his report, two maps and a bill for his services. Defendant asserts that these unqualified admissions establish: (1) that plaintiff signed only two copies of such contract; (2) that he kept one (plaintiff's Exhibit No. 1); (3) the other copy (defendant's Exhibit H) went to Amarillo with his letter of January 21, 1969. Defendant therefore asserts that plaintiff obviously could not have mailed a signed copy of such contract to defendant in September of 1968.

The fallacy in defendant's contention can best be ascertained from the examination of the two purported contracts introduced into evidence (plaintiff's Exhibit No. 1 and defendant's Exhibit H). The copy of the contract introduced by plaintiff contains the signatures of both plaintiff and James F. Smith, Jr. The copy of the contract introduced into evidence by defendant contains the signature of plaintiff but the signature of James F. Smith, Jr. thereon is not an original signature, but rather a photostat or xerographic copy of his signature. It is clear from the record that both of the contracts (duplicate originals) sent by defendant to plaintiff in April of 1968 were signed by James F. Smith, Jr., and had his signature thereon. Consequently, the copy of the contract mailed by plaintiff to defendant on January 21, 1969, could not have been one of the duplicate originals which were sent to plaintiff in April of 1968, as it does not contain the actual signature of James F. Smith, Jr. thereon. In addition, there is in the record the positive testimony of plaintiff that the two copies of the contract sent to him in April of 1968 signed by James F. Smith, Jr. were thereafter signed by him in September of 1968; and that the original of such contract was mailed by him to de-

fendant in the early part of September, 1968; and that the other signed copy was kept by him.

While there are some conflicts and inconsistencies in the testimony, there is sufficient evidence in the record to support the jury's answer to Special Issues Nos. 1, 4, 5 and 6. Defendant's Points of Error Nos. 1 through 9 are all overruled.

Defendant's Points of Error Nos. 11 through 16 pertain to the performance of the alleged contract. By such points defendant asserts that there is no evidence that plaintiff performed the work called for in the contract within a reasonable time; that the record establishes as a matter of law that plaintiff did not perform such work within a reasonable time; and that the evidence is factually insufficient to show that plaintiff ever performed the services or that he performed such services within a reasonable time.

Plaintiff testified that he commenced the work called for in the contract on September 16, 1968; that after about eight hours work he had an accident which damaged his equipment;[2] that he returned to San Antonio to repair his equipment; and that he did not return to New Mexico thereaf-

ter until about the middle of December, 1968, continuing working there until he completed his work on or about the first or second of January, 1969.

Defendant acknowledges that there is evidence in the record that plaintiff performed the services called for in the contract (plaintiff's own testimony), but contends that plaintiff's testimony regarding such performance is so fantastic and inconsistent that no reasonable person could accept such testimony as true. Plaintiff's testimony with regard to the performance of such work contains some conflicts and inconsistencies, particularly as to the details of exactly how he performed such work. Plaintiff stated on numerous occasions that he could not remember all of the details of just how he performed the work, since such work had been done about two years before, and that since such time he had made many other surveys. He testified that the full details of such work, including work sheets and profiles, were mailed to defendant at the same time his gamma ray survey report was sent to defendant, but were sent under separate cover; and that such work sheets and other explanatory matter were never returned to him. Although defendant admittedly received the gamma ray survey report,[3]

2. The equipment damaged was a Dodge 4-wheel drive truck which contained therein equipment for making a gamma ray survey. Such equipment performed somewhat the same function as a geiger counter or a scintillator, but is much more sophisticated and efficient, according to plaintiff. It can be used as a substitute for other geophysical methods of locating oil, gas and other minerals, such as seismographic operations. It is called a high power ionization chamber, capable of picking up gamma ray radiation from oil, gas or other minerals. The ionization chamber registers through a recorder, the chart of which is driven by a speedometer cable, which enables information to be obtained while driving over the terrain. On such chart the intensity values of the gamma rays are recorded in profile and produce

results similar to the record of an electric log. The information obtained is used in evaluating the possible productivity of land surveyed for minerals, including uranium. Plaintiff testfied that he ran off the road while working the first day, and his truck turned over on its side, damaging the ionization chamber.

3. The gamma ray survey report was introduced into evidence. It sets forth in some detail the work allegedly done by plaintiff. It recites that the survey was made to determine the location of any possible uranium ore deposits; that the property involved consists of approximately 10,240 acres of land, of which 2,240 were actually surveyed; that the mobile coverage consisted of 340 miles of gamma

which he returned to plaintiff, defendant categorically denies that it ever received the profiles, work sheets, and other explanatory matter which plaintiff testified he sent to it.

Plaintiff testified that he was in Grants, New Mexico, the area where the survey work was to be done, from approximately December 16, 1968, to January 2, 1969, and that he stayed at Travelodge motels most of the time, but that he spent about the first three days in another motel because Travelodge was filled up. This testimony is substantiated in part by the introduction into evidence of two receipts from Travelodge to plaintiff, one dated December 20, 1968, showing seven days of occupancy, and another covering the period of time from December 27, 1968, to January 2, 1969. He testified that he did the survey work called for in the contract during this period of time; and that in actuality he worked in excess of fifteen days. There is nothing in the record to completely refute this testimony, although there is testimony by one of defendant's employees that he was on the premises where the work was supposed to be done on a number of occasions during the time plaintiff testified he did the work; and that he never did see plaintiff on the premises or find any indication that he had done any work thereon. There is also testimony that due to the terrain, it would be almost impossible for plaintiff to have conducted his survey in the manner that he testified to.

Although reasonable minds might differ, we hold that there is sufficient evidence in the record to support the jury's finding that plaintiff performed the work called for in the contract.

■ A more difficult question is presented as to whether plaintiff performed such services within a reasonable time. Where the contract itself does not fix the time for performance, it will be presumed that the agreement will be performed within a reasonable time. 13 Tex. Jur.2d, Contracts, Section 290, and authorities therein cited. The term "reasonable time" has been defined by this Court as " 'such length of time as may fairly and properly and reasonably be allowed or required, having regard to the nature of the act or duty and to the attending circumstances; that time which as rational men the parties to a contract ought to have understood each other to have in mind; that time which preserves to each party the rights and advantages he possesses and protects each party from losses that he ought not to suffer.' " Lewis v. Clark, 149 S.W.2d 244, 247 (1941, writ dism'd judg. cor.).

The contract here involved calls for a commencement of performance on September 16, 1968, continuing until fifteen field operating days were completed. Plaintiff testified that he commenced the work on September 16, 1968, as provided for in the contract, but that he had an accident to his equipment that day after about eight hours of work, and that he had to return to San Antonio to repair his equipment. According to his own testimony, he did not return to New Mexico until at least December 15th. He further testified that he at no time notified defendant that he had commenced such work, nor did he notify defendant that he had a breakdown of his equipment, or that there would be a delay in performing the work. There is testimony that he was in communication with defendant's president on occasions during such period of delay, but no mention was ever made that such work had been started

ray profiles; and that the work involved also included 640 hand stations. The report contains an interpretation of the

work done and contains plaintiff's recommendations as to possible future mineral exploration.

or that there had been a breakdown which would cause a delay in completing such work. There was introduced into evidence a letter from said president to plaintiff dated September 19, 1968, in which acknowledgement is made of a letter from plaintiff dated September 14, 1968, and reference is made to uranium exploration. This letter concludes: "Enclosed herewith is our check in the amount of $568.46, which covers your work to date. I will let you know how we want to proceed if we decide to evaluate further. I hope everything is going well with you." Plaintiff acknowledged he received such letter, and it was admitted into evidence without objection. Despite this letter, it appears from plaintiff's own testimony that he did not see fit to inform defendant that he had commenced the work provided for in the contract, and had a breakdown which would cause a substantial delay.

Although the contract contemplates only fifteen days of work, plaintiff's own testimony establishes that a delay of three months ensued after a breakdown of the equipment without defendant ever being notified of such breakdown or of the long period of delay which ensued thereafter. There is nothing in the record showing why a delay of three months was reasonable or necessary.

Under the record the evidence is factually insufficient to support the jury's answer that plaintiff performed the services called for in the contract within a reasonable time, and the jury's answer thereto is against the great weight and preponderance of the evidence.

Since this cause must be remanded for a new trial, we deem it not necessary to pass on defendant's Point of Error No. 10 that the jury's answer to Special Issues Nos. 1 and 5 are in irreconcilable and fatal conflict.

The cause is reversed and remanded.